```
                                        ┌──────────────────────────────┐
                                        │ USDC SDNY                    │
                                        │ DOCUMENT                     │
                                        │ ELECTRONICALLY FILED         │
                                        │ DOC #: _____  │
                                        │ DATE FILED:   8/11/2016      │
                                        └──────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JACOB FRYDMAN,                                  :

                              Plaintiff,        :       **REPORT AND
                                                        RECOMMENDATION
                                                        TO THE HONORABLE
              -against-                         :       PAUL A. CROTTY**

EXPERIAN INFORMATION                            :       14cv9013-PAC-FM
SOLUTIONS, INC., et al.,
                                                :

                              Defendants.
--------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

       Pro se plaintiff Jacob Frydman ("Frydman") brings this action under the

Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., against Experian

Information Solutions, Inc. ("Experian"), Equifax Information Services LLC ("Equifax"),

and Trans Union, LLC ("Trans Union") (collectively, the "Defendants").[1]  Frydman

alleges that the Defendants are liable under the FCRA and New York state law because

they failed to prevent the inclusion of certain inaccurate items in his credit file, causing

him, among other things, to be denied credit or offered unfavorable terms on several large

bank loans.  For these alleged wrongs, he seeks actual as well as punitive damages.  (See

ECF No. 29 ("Amended Complaint" or "Am. Compl.")).

---

[1]     Although Frydman initially named Equifax Inc. as a defendant, the parties
subsequently stipulated to the substitution of the correct entity.  (See ECF No. 49).  Additionally,
counsel appearing in this matter on behalf of Trans Union has indicated that Frydman incorrectly
named Transunion Risk and Alternative Data Solutions, Inc., a separate entity.  (See ECF No. 43
at 55).  The Amended Complaint therefore should probably be deemed further amended to
substitute Trans Union for this entity.

Following the close of discovery, the Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 95). The parties also have filed five motions to strike. (ECF Nos. 126, 129, 135, 139, 142). For the reasons set forth below, the Defendants' motion for summary judgment should be granted in part and denied in part, and the parties' motions to strike should be denied.

I.      Relevant Facts[2]

Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to Frydman.

A.      The Parties

As an individual, Frydman is a "consumer" within the meaning of the FCRA. 15 U.S.C. § 1681a(c). Frydman describes himself as a "real estate developer and investor for more than 35 years," and also as an inactive member of the Ohio bar. (Frydman Decl. ¶ 5). Among the positions he has held over the years, Frydman was once

_____

[2]      The factual recitation in this Report and Recommendation is derived from the following: ECF No. 97 (Defs.' Joint Rule 56.1 Stmt. ("Defs.' 56.1 Stmt.")); ECF No. 98 (Decl. of Camille R. Nicodemus, Esq., dated Jan. 4, 2016 ("Nicodemus Decl.")), Ex. A (excerpts from Tr. of Pl.'s Dep., dated July 23, Sept. 10 and 11, 2015 ("Frydman Tr.")); ECF No. 99 (Aff. of Elizabeth Wilson, sworn to on Jan. 4, 2016 ("Wilson Aff.")); ECF No. 102 (Decl. of Jason Scott, dated Jan. 4, 2016 ("Scott Decl.")); ECF No. 109 (Decl. of Margaret Leslie, dated Jan. 4, 2016 ("Leslie Decl.")); ECF No. 110 (Decl. of Pamela Smith, dated Jan. 4, 2016 ("Smith Decl.")); ECF No. 118 (Pl.'s Corrected Resp. to Defs.' 56.1 Stmt. ("Pl.'s 56.1 Resp.")); ECF No. 119 (Corrected Decl. of Jacob Frydman, dated Jan. 25, 2016 ("Frydman Decl.")).

Frydman and the Defendants each have designated portions of their motion papers as "Confidential" pursuant to a protective order entered on April 10, 2015. (ECF No. 18). The last paragraph of the protective order expressly cautions that "[n]othing set forth herein binds the Court." (Id. ¶ 15). I do not consider any of the information in this Report and Recommendation sufficiently personal or proprietary to warrant redaction. Accordingly, I am publicly filing this entire Report and Recommendation.

the chief executive officer and chairman of the board of United Realty Trust, Inc., a public real estate investment trust with more than one thousand shareholders.  (Id.; Defs.' 56.1 Stmt. ¶ 19).

The Defendants are consumer reporting agencies ("CRAs").[3]  (Wilson Aff. ¶ 2; Scott Decl. ¶ 3; Leslie Decl. ¶ 5).  In the course of their work, the Defendants gather information from creditors and other sources in order to maintain credit files on more than 200 million consumers in the United States.  (Wilson Aff. ¶¶ 4, 6; Scott Decl. ¶¶ 3-4; Leslie Decl. ¶¶ 6-7).  They then provide "credit reports" to third parties, such as insurers or employers, engaged in credit-related transactions, as well as "consumer disclosures" to consumers regarding their own credit files.  (Wilson Aff. ¶ 20; Scott Decl. ¶ 3; Smith Decl. ¶¶ 6-8).

B.    Frydman's Disputes

On September 11, 2014, Frydman obtained his consumer disclosures from each of the Defendants.  (Frydman Decl. ¶ 15; id., Ex. B ("September 11 Disclosures")).[4] On September 22, Frydman sent separate letters to the designated post office boxes of each of the Defendants ("September 22 Letters") disputing the accuracy of five items in

---

[3]    Under the FCRA, a CRA is defined as "any person which, for monetary fees, . . . regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and . . . uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."  15 U.S.C. § 1681a(f).

[4]    Frydman's exhibit lettering system and references thereto are at times difficult to decipher.  To ensure consistency, I have used the exhibit letters listed at the end of his declaration.  (See Frydman Decl. at 30-31).

the September 11 Disclosures:  (1) a civil judgment entered on July 1, 2014; (2) a Porsche

Financial Services ("Porsche Financial") account; (3) a Chase Auto account; (4) a Capital

One Auto account opened in 2005; and (5) a Capital One Auto account opened in 2006.

(Wilson Aff. ¶¶ 44-45; Scott Decl. ¶ 19; Smith Decl. ¶¶ 33-34; Frydman Decl. ¶ 33; see

also Wilson Aff., Ex. A (letter to Trans Union); Scott Decl., Ex. A (letter to Experian);

Smith Decl., Ex. A (letter to Equifax)).[5]

       1.    Civil Judgment

      On or about April 24, 2013, Atlantic Concrete Foundation, Inc. ("Atlantic

Concrete") commenced a lawsuit in Supreme Court, Ulster County, against Frydman, his

wife, and two business entities that Frydman managed.  (Defs.' 56.1 Stmt. ¶ 3; Pl.'s 56.1

Resp. ¶ 3).  The action arose out of an alleged failure to pay for labor and materials

furnished in connection with certain real property improvements.  (Id.).  On July 1, 2014,

the court entered a default judgment in the amount of $100,374 against Frydman and his

co-defendants in that suit ("Atlantic Concrete Judgment").  (Defs.' 56.1 Stmt. ¶ 4).

      On August 29, 2014, Ulster County Justice Christopher E. Cahill signed an

order directing that the Atlantic Concrete Judgment be vacated.  (Id. ¶ 5; Wilson Aff., Ex.

A at 5-6 ("August 29 Order")).  The August 29 Order bears an "Index No." of 13-1406

and an "RJI No." of 55-14-00739.  (See August 29 Order).  Several days later, on

---

    [5]    In all three letters, Frydman cited the details of the five disputed items as reported
by Trans Union, although Experian's and Equifax's reporting actually differed somewhat.  The
letters consequently were identical in all relevant respects, and I have cited to them collectively.

September 5, the Ulster County Clerk stamped the August 29 Order as having been "entered."  (Defs.' 56.1 Stmt. ¶ 6; Frydman Tr. 545-47).[6]

      Despite the vacatur, in the September 11 Disclosures, the Defendants each reported a civil judgment in favor of Atlantic Concrete, dated July 1, 2014, with an entirely different "Reference No." of 20145467.  (September 11 Disclosures at 5).  The remaining details, however, differed somewhat:  Experian reported a judgment of $100,374 in "Tompkins Cnty Supreme;"[7] Equifax, a judgment of $100,000 in "Ulster Cty;" and Trans Union, a judgment of $100,374 in "Circuit Court."  (Id.).  In the September 22 Letters, Frydman stated that the Atlantic Concrete Judgment had been vacated; in support, he attached a copy of the August 29 Order, without the September 5 clerk's stamp.  (September 22 Letters at 1; see also Wilson Aff. ¶ 45; Scott Decl. ¶ 19; Smith Decl. ¶ 36; Pl.'s 56.1 Resp. ¶¶ 11-12; Frydman Decl. ¶ 35).

     2.   Porsche Financial Account

      Frydman also disputed a Porsche Financial account that the Defendants each had reported as "charged off."  (September 22 Letters at 2; see also Wilson Aff. ¶ 45; Scott Decl. ¶ 22; Smith Decl. ¶¶ 42-43; September 11 Disclosures at 17).  In the September 22 Letters, Frydman informed the Defendants that this account "was a one-

---

     [6]    Frydman testified at his deposition that he never previously had seen a copy with the September 5 clerk's stamp, (see Frydman Tr. 544-45), but nonetheless admits that the August 29 Order was filed on September 5, (see Pl.'s 56.1 Resp. ¶ 12).

     [7]    In a separate credit report produced for Frydman, Experian listed a street address for Tompkins Supreme in Kingston, New York, which, of course, is in Ulster County. (See Scott Decl., Ex. D).

time up front lease payment and there was no charge off of any amount," but enclosed no additional documentation.  (September 22 Letters at 2).

Frydman maintains that he subsequently sent the Defendants copies of a letter from Porsche Financial, dated September 24, 2014.  (Pl.'s 56.1 Resp. ¶¶ 13-14). This letter, addressed to Frydman and signed by Jackie Williams of Customer Remarketing, thanked Frydman for "alerting Porsche Financial . . . of an inaccuracy on [his] credit report(s)," indicated that Frydman's account was "in good standing and reflecting as paid/closed, full termination/obligation satisfied," and assured him that "the charge off ha[d] been removed from [Porsche Financial's] system."  (Nicodemus Decl., Ex. B ("Porsche Financial Letter")).  The letter further noted that, while Porsche Financial had "requested Equifax, TransUnion and/or Experian to correct their records, these companies are independent of [Porsche Financial], and [Porsche Financial] cannot require them to make the correction in a timely manner."  (Id.).

Frydman's letters enclosing the Porsche Financial Letter were dated October 20 (Equifax), and 22 (Trans Union and Experian), 2014, respectively.  (See Scott Decl., Ex. K (letter to Equifax); Smith Decl., Ex. B (letter to Experian); Frydman Decl., Ex. D (letter to Trans Union)).  Frydman addressed these letters to the Defendants' legal officers, not the post office boxes to which he sent the September 22 Letters.  (Wilson Aff. ¶ 52; Scott Decl. ¶ 29; Smith Decl. ¶¶ 55-56; Pl.'s 56.1 Resp. ¶¶ 13-14).[8]

---

[8]     These letters also enclosed drafts of the complaints Frydman intended to file in this Court absent a satisfactory resolution of the discrepancies.

### 3. Additional Accounts

Finally, Frydman disputed three additional automobile financing accounts that the Defendants each had reported as thirty days past due:  (a) a Chase Auto account; (b) a Capital One Auto account opened in 2005; and (c) a Capital One Auto account opened in 2006.  (September 22 Letters at 2-3; see also Defs.' 56.1 Stmt. ¶¶ 8-9; Smith Decl. ¶¶ 46, 49, 53; September 11 Disclosures at 15, 17).  Frydman denied that any of these accounts ever were thirty days past due, but provided no additional documentation. (See September 22 Letters).

### C. Defendants' Reinvestigations

Each of the Defendants addressed Frydman's disputes in accordance with its own standard procedures.  (Wilson Aff. ¶¶ 46-49; Scott Decl. ¶ 19; Smith Decl. ¶ 35). Those procedures included contacting creditors Porsche Financial, Chase Auto, and Capital One Auto, (Wilson Aff. ¶¶ 47-49; Scott Decl. ¶¶ 22-23; Smith Decl. ¶¶ 44, 47, 50), as well as the Defendants' contracted public records vendor, LexisNexis Risk Data Services LLC ("LexisNexis"), (Wilson Aff. ¶ 46; Scott Decl. ¶ 21; Smith Decl. ¶ 39; see also Leslie Decl. ¶¶ 8-11).  Communications between the Defendants and these entities generally are made using an electronic form called an Automated Consumer Dispute Verification ("ACDV"), which allows the use of pre-defined codes and phrases as well as optional customized narratives to describe the matter in dispute.  (Smith Decl. ¶¶ 24-26, 28).

1.    Trans Union

Trans Union maintains that the August 29 Order could not be used to modify Frydman's credit file because it was not court-stamped.  (Wilson Aff. ¶ 46). Trans Union consequently contacted LexisNexis regarding the Atlantic Concrete Judgment.  (Id.).  In its response, LexisNexis did not indicate that the judgment had been vacated.  (Id. ¶ 46 & Ex. B).  Accordingly, Trans Union made no change at that time. Trans Union maintains that it ultimately removed the Atlantic Concrete Judgment from Frydman's credit file on December 2, 2014.  (Id. ¶ 55).  For his part, Frydman concedes only that the judgment was removed some time before March 16, 2015.  (See Pl.'s 56.1 Resp. ¶ 74).

Trans Union also sent an ACDV to Porsche Financial.  (Wilson Aff. ¶ 49). When Porsche Financial did not respond within thirty days, Trans Union removed the account from Frydman's credit file.  (Id.).[9]  Finally, Trans Union sent ACDVs to Chase Auto and Capital One Auto.  (Id. ¶¶ 47-48 & Exs. C-E).  Both creditors verified that the late payment reports were accurate.  (Id.).  On October 22, 2014, Trans Union sent Frydman a copy of its reinvestigation results.  (Id. ¶ 50 & Ex. F).  Notwithstanding Chase Auto's response, Trans Union indicated in its results that the Chase Auto account subsequently had been updated to report as current.  (Id., Ex. F at 5).

---

[9]    Trans Union denies receiving the Porsche Financial Letter at the time because it was sent to an entity other than Trans Union.  (Id. ¶¶ 52-54).

8

2.     Experian

Experian maintains that it could not use the August 29 Order to modify

Frydman's credit file because it contained a different case number, was filed in a different

court, and did not have an official seal or stamp.  (Scott Decl. ¶ 20).  Accordingly,

Experian sent an ACDV to LexisNexis.  LexisNexis responded, but did not indicate that

the Atlantic Concrete Judgment had been vacated.  (Id. ¶ 21 & Ex. C).  Eventually,

however, Experian removed the Atlantic Concrete Judgment from Frydman's credit file

on November 25, 2014.  (Id. ¶ 27).

Experian also sent ACDVs to Porsche Financial and Chase Auto.  (Id.

¶¶ 22-23 & Exs. E-F).  Porsche Financial responded, but did not indicate that any changes

should be made.  (Id. ¶ 22 & Ex. E).[10]  Chase Auto requested that Experian update its

credit file to indicate that Frydman's account was current, which Experian did.  (Id. ¶ 23

& Ex. F).  Finally, Experian determined that Frydman previously had disputed – and

Experian previously had reinvestigated – both Capital One Auto accounts.  (Id. ¶ 25

& Exs. I-J).  Accordingly, Experian sent Frydman a letter, dated October 1, 2014, which

stated that, "unless [Frydman] sen[t] [Experian] relevant information to support [his]

claim, [Experian] w[ould] not investigate this information again."  (Id., Ex. G at 3; see

also id. ¶ 24).  Despite the October 1 letter, Frydman did not provide Experian any

additional information regarding the Capital One accounts before this lawsuit was filed.

---

[10]     Experian denies receiving the Porsche Financial Letter prior to the commencement of this action, (id. ¶ 29), but removed the account from Frydman's credit file on April 23, 2015, (id. ¶ 28).

(See Pl.'s 56.1 Resp. ¶ 184).  On October 14, 2014, Experian informed Frydman of its reinvestigation results.  (Scott Decl. ¶¶ 21-23 & Ex. D).

        3.     Equifax

Equifax maintains that it could not use the August 29 Order to modify Frydman's credit file because it contained a different reference number.  (Smith Decl. ¶ 38).  Like Trans Union and Experian, Equifax sent an ACDV to LexisNexis, which responded, but failed to indicate that the Atlantic Concrete Judgment had been vacated. (Id. ¶ 40).[11]

Equifax also sent ACDVs to Porsche Financial, Chase Auto, and Capital One Auto.  (Id. ¶¶ 44, 47, 50).  Porsche Financial responded, but did not indicate that any changes should be made.  (Id. ¶ 44).[12]  Chase Auto requested that Equifax update Frydman's credit file to indicate that the account was "paid as agreed," and Equifax complied.  (Id. ¶ 48).  Capital One also responded, but did not indicate that any changes should be made to the account opened in 2006.  (Id. ¶ 51).  Equifax did not reinvestigate the Capital One account opened in 2005 because it did not report it in the September 11 Disclosures.  (Id. ¶ 53).  On October 15, 2014, Equifax informed Frydman of its reinvestigation results.  (Id. ¶¶ 35, 41, 45, 48, 52, 54).

---

[11]     LexisNexis did indicate that Equifax should change the amount of the Atlantic Concrete Judgment from $100,000 to $100,374.  (Id.).

[12]     Equifax maintains that it did not process the Porsche Financial Letter in accordance with its standard reinvestigation procedures because it was sent to the incorrect department.  At a later date, however, Equifax updated the account to read "paid as agreed."  (Id. ¶¶ 57-58).

D.     Damages

Most of the damages Frydman seeks arise out of four bank loans that were

modified or denied between September 2014 and April 2015.[13]  He also seeks nominal

damages related to two personal credit accounts.  He alleges that the Defendants'

reporting of inaccurate information in his credit file proximately caused these damages.

1.     Failed Purchase of SDC Properties

Frydman first contends that the National Bank of Cambridge denied him a

$1 million loan in September or October 2014 because his credit score did not meet its

minimum standards.  (Defs.' 56.1 Stmt. ¶ 21; Frydman Tr. 147-51).  According to

Frydman, he intended to transfer this $1 million to a shell entity and use it to purchase the

National Bank of Cambridge's participation interest in a loan to Sojourner-Douglass

College ("SDC").  (Defs.' 56.1 Stmt. ¶¶ 22, 24; Frydman Tr. 152-54).  Frydman then

planned to combine the income from that participation interest with a larger multi-million

dollar loan from a second institution, American Bank, in order to acquire, through shell

entities, two commercial properties SDC owned in Baltimore, Maryland.  (Defs.' 56.1

Stmt. ¶¶ 25, 27-28; Frydman Tr. 154-59).  Frydman maintains that the American Bank

loan, for which he expected to be the guarantor, did not close as planned in October 2014

because the National Bank of Cambridge loan was denied.  (Defs.' 56.1 Stmt. ¶ 26;

---

[13]     The Defendants have moved to strike many of the documents Frydman likely
would rely upon at trial to prove these alleged damages.  (See ECF Nos. 126-27).  For purposes
of this Report and Recommendation, I have disregarded the significant evidentiary hurdles he
would face, not the least of which is the hearsay rule.

Frydman Tr. 159-61; Pl.'s 56.1 Resp. ¶ 25).  Frydman consequently was unable to purchase the SDC properties.  (Frydman Tr. 161-62).

Frydman alleges that his damages resulting from his inability to purchase the SDC properties include:  (a) $380,000 in "management and asset management fees" that would have been paid to him by the various shell entities, (Defs.' 56.1 Stmt. ¶¶ 35-36; Frydman Tr. 162-64); (b) $169 million in "lost rental stream" he would have earned from leasing the properties back to SDC after the purchase, (Defs.' 56.1 Stmt. ¶ 37; Frydman Tr. 81-83); and (c) $10 million of alleged "spread" between the acquisition price and the value of the SDC properties, (Defs.' 56.1 Stmt. ¶ 38; Frydman Tr. 83-84).

2.   Modified Loans

Frydman also seeks damages on the theory that two additional bank loans were unfavorably modified.

First, Frydman alleges that, in December 2014, UBS Bank ("UBS") reduced a $6.5 million loan to $5.5 million and required an additional $940,000 in up-front cash because of "a problem with credit," forcing him to secure a separate mezzanine loan to complete the transaction as planned.  (Frydman Tr. 517-25; Pl.'s 56.1 Resp. ¶¶ 39, 42; Frydman Decl. ¶ 43).  The UBS loan was made to a limited liability company controlled by Frydman and used to purchase a corporate headquarters in New Jersey. (Defs.' 56.1 Stmt. ¶¶ 39-40; Frydman Tr. 517, 529; Pl.'s 56.1 Resp. ¶ 40).

In addition, Frydman alleges that, in April 2015, the Bank of Princeton modified the terms of a second $6.5 million loan, requiring him to place $1 million in

escrow until his credit score improved.  (Defs.' 56.1 Stmt. ¶¶ 43, 46; Frydman Tr. 169-73; Pl.'s 56.1 Resp. ¶ 43).  This loan also was made to a shell entity and used to purchase the corporate headquarters of a healthcare company in New Jersey.  (Defs.' 56.1 Stmt. ¶¶ 43-44; Frydman Tr. 169-71; Pl.'s 56.1 Resp. ¶¶ 43-44).

### 3.    Personal Accounts

Finally, Frydman claims modest damages related to two personal accounts. He alleges that, in March 2015, Mazda increased the payments on a vehicle he leased for his housekeeper by $20 per month over a 36-month term.  (Defs.' 56.1 Stmt. ¶¶ 51-52; Frydman Tr. 180-82, 547-48).  He also alleges that, in May 2015, Bank of America did not renew an expired credit card in his name, which caused him to forfeit reward points. (Defs.' 56.1 Stmt. ¶¶ 54-55; Frydman Tr. 184-85).

## II.    Procedural Background

On November 12, 2014, Frydman filed separate actions against Experian, Equifax, and Trans Union, alleging FCRA violations.  (See ECF No. 1; Frydman v. Equifax Inc., 14cv9015-PAC-FM, ECF No. 1; Frydman v. Transunion Risk and Alternative Data Sols., Inc., 14cv9016-PAC-FM, ECF No. 1).  On April 21, 2015, the three cases were consolidated for all purposes under this docket number.  (ECF No. 20).

On May 11, 2015, at the Court's direction, Frydman filed the Amended Complaint.  (Am. Compl.).  In addition to his FCRA claims, Frydman asserted New York state law claims against the Defendants for negligent misrepresentation, defamation, defamation per se, negligence, and injurious falsehood.  (See id. ¶¶ 70-101, 106-37, 142-

73).  The Amended Complaint seeks "not less than" $5 million in actual damages and $25 million in punitive damages from each of the Defendants.  (Id. at 34).

On January 4, 2016, the Defendants filed a joint motion for summary judgment.  (ECF No. 95).  Frydman filed opposition papers on January 25 and 27, 2016, (ECF Nos. 112-19), and on February 8, the Defendants each filed reply papers, (ECF Nos. 122-24).  The motion consequently is fully submitted.

On February 8, 2016, the Defendants filed a joint motion to strike portions of Frydman's declaration in opposition to their summary judgment motion.  (ECF No. 126).  On February 22, Frydman filed opposition papers, (ECF Nos. 132-34), and on March 3, the Defendants filed a joint reply, (ECF No. 145).  In addition, between February 22 and 29, Frydman filed four separate motions to strike portions of three declarations and an affidavit submitted by the Defendants in support of their summary judgment motion.  (ECF Nos. 129, 135, 139, 142).  The Defendants responded individually, (ECF Nos. 146, 148, 152), and Frydman then filed three separate replies, (ECF Nos. 153-55).[14]  The five motions to strike consequently also are fully submitted.

III.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any

---

[14]    As the Defendants correctly note, (see ECF No. 145 at 2; ECF No. 146 at 5; ECF No. 152 at 2), Frydman has repeatedly attempted to supplement his summary judgment opposition papers through his briefing on the motions to strike.  This is improper, especially in light of my previous denial of his request to extend the summary judgment briefing schedule.  (See ECF No. 93).  For that reason, I have not considered any such supplemental arguments in this Report and Recommendation.

material fact" based on supporting materials in the record.  Fed. R. Civ. P. 56.  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"  Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party.  Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002).  To defeat a motion for summary judgment, the nonmoving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.

Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court.  Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997); see also Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment.  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  Fischl, 128 F.3d at 55.

Although the same summary judgment rules apply to a party proceeding <u>pro se</u>, special latitude is ordinarily appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded.  <u>See</u> <u>McPherson v. Coombe</u>, 174 F.3d 276, 280 (2d Cir. 1999) (pleadings should be read liberally and interpreted to "raise the strongest arguments that they suggest") (quoting <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994)).  Here, however, Frydman is a law school graduate, so these concerns are somewhat alleviated.  <u>See</u> <u>Harbulak v. Suffolk Cty.</u>, 654 F.2d 194, 198 (2d Cir. 1981) (noting that the plaintiff was a lawyer and therefore could not "claim the special consideration which the courts customarily grant to <u>pro se</u> parties").

IV.   <u>Relevant Law</u>

The FCRA has as its central purpose ensuring the "confidentiality, accuracy, relevancy, and proper utilization of [consumers' credit] information." 15 U.S.C. § 1681(b).  In pursuit of this goal, the statute "creates a private right of action against [CRAs] for the negligent <u>or</u> willful violation of any duty imposed under th[e] statute."  <u>Casella v. Equifax Credit Info. Servs.</u>, 56 F.3d 469, 473 (2d Cir. 1995) (citing 15 U.S.C. §§ 1681o (negligent violations), 1681n (willful violations)) (emphasis added).  In his Amended Complaint, Frydman relies upon the Defendants' duties under two separate provisions of the FCRA:  15 U.S.C. §§ 1681e(b) ("Section 1681e(b)") and 1681i(a)(1)(A) ("Section 1681i(a)(1)(A)").  (<u>See</u> Am. Compl. ¶¶ 67-68, 103-04, 139-40.)

A.    Section 1681e(b)

Section 1681e(b) provides that "[w]henever a [CRA] prepares a [credit] report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).  To prevail on a claim for the negligent violation of this provision, a plaintiff must establish that:  (1) the CRA's credit report contained inaccurate information; (2) the CRA negligently failed to follow reasonable procedures to assure the accuracy of the report; (3) the plaintiff was injured; and (4) the CRA's negligence was the proximate cause of the plaintiff's injury.  Gorman v. Experian Info. Sols., Inc., No. 07 Civ. 1846 (RPP), 2008 WL 4934047, at *4 (S.D.N.Y. Nov. 19, 2008).  To prevail on a claim for willful violation, a plaintiff must show only "(1) inaccuracy and (2) a failure to follow reasonable procedures that is (3) knowing or reckless."  Wenning v. On-Site Manager, Inc., No. 14 Civ. 9693 (PAE), 2016 WL 3538379, at *8 (S.D.N.Y. June 22, 2016).  For both negligent and willful violations of Section 1681e(b), "the threshold question is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the [CRA]'s procedures is necessary."  Gorman, 2008 WL 4934047, at *4 (quoting Houston v. TRW Info. Servs., Inc., 707 F. Supp. 689, 691 (S.D.N.Y. 1989)).

B.    Section 1681i(a)(1)(A)

Section 1681i(a)(1)(A) provides that "if the completeness or accuracy of any item of information contained in a consumer's file at a [CRA] is disputed by the

consumer and the consumer notifies the [CRA] . . . of such dispute, the [CRA] shall, free

of charge, conduct a reasonable reinvestigation to determine whether the disputed

information is inaccurate and record the current status of the disputed information, or

delete the item from the file" within thirty days of receiving notice of the dispute.  15

U.S.C. § 1681i(a)(1)(A).  As with Section 1681e(b), "[a] plaintiff asserting claims under

[Section] 1681i must demonstrate that the disputed information is inaccurate in order to

prevail on allegations that a [CRA] had failed to reasonably reinvestigate a disputed

item."  Fashakin v. Nextel Commc'ns, No. 05 Civ. 3080 (RRM), 2009 WL 790350, at

*11 (E.D.N.Y. Mar. 25, 2009) (citing DeAndrade v. Trans Union LLC, 523 F.3d 61, 67

(1st Cir. 2008)) (noting that a majority of federal appellate courts have adopted this rule).

      C.    Damages

      A plaintiff successful on a claim for the negligent violation of duties under

either Section 1681e(b) or 1681i(a)(1)(A) is entitled to recover only actual damages.  See

15 U.S.C. § 1681o.  The plaintiff bears the burden of showing that inaccurate information

in his credit file proximately caused those damages.  Gorman, 2008 WL 4934047, at *6.

For willful violations, however, a plaintiff may recover (1) either actual damages or

statutory damages between $100 and $1,000, and (2) punitive damages.  See 15 U.S.C.

§ 1681n.  Indeed, "punitive damages may be available even where a plaintiff has suffered

no actual damages."  Casella, 56 F.3d at 476.

V.    Discussion

   A.    Inaccuracy

        As a threshold matter, to assert a successful claim under either Section

1681e(b) or Section 1681i(a)(1)(A), Frydman must establish that the September 11

Disclosures contained inaccurate information.  See Gorman, 2008 WL 4934047, at *4;

Fashakin, 2009 WL 790350, at *11.

        It is undisputed that on July 1, 2014, a state court default judgment in the

amount of $100,374 was entered in Ulster County against Frydman and in favor of

Atlantic Concrete.  (Defs.' 56.1 Stmt. ¶ 4).[15]  It similarly is undisputed that on August 29,

2014, Justice Cahill signed an order directing that the Atlantic Concrete Judgment be

vacated, (id. ¶ 5), and that the Ulster County Clerk stamped the August 29 Order as

"entered" on September 5, (id. ¶ 6; Frydman Tr. 545-47).  Nonetheless, in the September

11 Disclosures, the Defendants each reported a civil judgment, dated July 1, 2014, in

favor of Atlantic Concrete, for an amount in excess of $100,000.  (See September 11

Disclosures at 5).  Even more curiously, after completing their reinvestigations between

October 14 and 22, the Defendants each continued to report the Atlantic Concrete

Judgment.  (See Wilson Aff., Ex. F; Scott Decl., Ex. D; Smith Decl. ¶¶ 40-41).

Accordingly, even though there may have been discrepancies between the August 29

Order and the September 11 Disclosures with regard to the reference number and the

---

        [15]    Although the Defendants refrain from admitting that the Atlantic Concrete
Judgment was entered in Ulster County, this fact cannot seriously be disputed.  (See August 29
Order).

jurisdiction where the judgment was entered, a jury reasonably could conclude that the

Defendants inaccurately reported the Atlantic Concrete Judgment after it had been

vacated.

Similarly, a reasonable jury could conclude that the Defendants inaccurately

reported the Porsche Financial account as charged off.  (See September 11 Disclosures at

17).  Frydman has produced a letter from Porsche Financial, dated September 24, 2014,

which stated that Frydman's account was "in good standing and reflecting as paid/closed,

full termination/obligation satisfied," and that "the charge off ha[d] been removed from

[Porsche Financial's] system."  (Porsche Financial Letter).  As Trans Union suggests, this

language could be read to indicate that the charge off was accurate as of the September 11

Disclosures, but that Frydman subsequently satisfied his indebtedness.  (See ECF No. 122

("Trans Union Reply") at 5).  Nonetheless, it could also be read to indicate that the

Defendants inaccurately reported the Porsche Financial account as charged off prior to

September 24.  Indeed, Frydman states that the underlying transaction involved a single-

payment lease, which by definition could not have been in arrears.  (See Frydman Decl.

¶ 14).[16]  Although Trans Union deleted the account after Porsche Financial failed to

---

[16]     Although the Defendants deny receiving the Porsche Financial Letter around
September 24, (see Wilson Aff. ¶ 54; Scott Decl. ¶ 29; Smith Decl. ¶ 57), it is probative of
inaccuracy regardless of when it was received.  The Defendants also challenge the letter based
on Frydman's failure to authenticate it properly as a "record of regularly conducted activity"
pursuant to Federal Rule of Evidence 803(6).  (See ECF No. 127 at 3).  This, of course, is a
defect that Frydman could easily cure prior to trial.  Since he is proceeding pro se, and the
Defendants do not seriously dispute the letter's authenticity, it would be a miscarriage of justice
to grant summary judgment on this ground.  Indeed, Frydman's own sworn statement is
sufficient to create a factual issue as to whether the Porsche Financial account was in arrears.

respond, (Wilson Aff. ¶ 49), Experian and Equifax continued to report the account as charged off even after completing their reinvestigations, (Scott Decl., Ex. D; Smith Decl. ¶¶ 44-45).

Finally, Frydman does not assert willful violation claims with regard to the three remaining automobile financing accounts, (see ECF No. 117 (Pl.'s Corrected Mem. of Law in Opp. to Mot. for Summ. J. ("Pl.'s Mem.")) at 17-18; Frydman Decl. ¶ 31), and his negligent violation claims regarding these accounts all fail for reasons set forth in the following section of this Report and Recommendation. The Court therefore need not resolve whether Frydman's own statement that these accounts were never thirty days past due, unaccompanied by any supporting evidence, is sufficient proof of inaccuracy.

B.     Negligent Violations

A consumer seeking damages for the negligent violation of Section 1681e(b) or 1681i(a)(1)(A) may recover only his actual damages. See 15 U.S.C. § 1681o. Here, however, Frydman has not proffered any evidence from which a reasonable jury could conclude that he suffered any actual damages cognizable under the FCRA. Accordingly, even if the Court were to assume that the Defendants negligently violated their duties to assure reasonable accuracy and to conduct a reasonable reinvestigation, Frydman's claims for the negligent violation of these duties could not survive summary judgment. See Selvam v. Experian Info. Sols., Inc., --- F. App'x ---, 2016 WL 3180140, at *2 (2d Cir. June 7, 2016) (affirming grant of summary judgment because plaintiff failed to "allege any way in which he was damaged by the alleged inaccuracy" and,

therefore, did "not plausibly allege he suffered any actual damages") (citing Casella, 56 F.3d at 475).

### 1. Business Damages

Frydman claims millions of dollars in damages as a result of the denial or modification of four bank loans.  (See Defs.' 56.1 Stmt. ¶¶ 21-22, 24-28, 35-40, 43-44, 46; Frydman Tr. 81-84, 147-64, 169-73, 517-21, 529).  Although the structure of the underlying real estate transactions was complex, he apparently intended to use the proceeds of these loans to purchase commercial properties in New Jersey and Maryland through separate shell entities.  (Id.).  Frydman argues that he is entitled to damages because his ability to obtain these loans was adversely affected by "[the] Defendants' wrongful[] disseminati[on of] inaccurate information regarding [his] credit file to prospective credit grantors."  (Pl.'s 56.1 Resp. ¶ 40).  What Frydman overlooks, however, is that the FCRA does not apply to consumers' business transactions.  See, e.g., George v. Equifax Mortg. Servs., No. 06 Civ. 971 (DLI) (LB), 2010 WL 3937308, at *2 (E.D.N.Y. Oct. 5, 2010) ("[I]t is well established that the FCRA does not apply to business or commercial transactions, even when a consumer's credit report impacts such transactions."); Lucchesi v. Experian Info. Sols., Inc., 226 F.R.D. 172, 174 (S.D.N.Y. 2005) (credit report "issued in connection with a business operated by the consumer" could not "form the basis of liability under the FCRA"); Frost v. Experian, No. 98 Civ. 2106 (JGK) (JCP), 1999 WL 287373, at *5 (S.D.N.Y. May 6, 1999) ("The FCRA applies only to reports that relate to the consumer's applications for personal credit, not to his

22

business transactions."); Podell v. Citicorp Diners Club, Inc., 914 F. Supp. 1025, 1036

(S.D.N.Y. 1996), aff'd, 112 F.3d 98 (2d Cir. 1997) ("[I]t is clear from its legislative

history that the [FCRA] was intended to apply only to reports which relate to the

consumer's eligibility for personal credit or other commercial benefits as a consumer, and

not to the consumer's business transactions.") (second alteration in original) (quoting

Boothe v. TRW Credit Data, 523 F. Supp. 631, 633 (S.D.N.Y. 1981)).

   Since there is no dispute that all four of the loans at issue were intended

"for business purposes," Frydman's damages, if any, were unquestionably "business-

related."  (See Pl.'s 56.1 Resp. ¶¶ 29, 35, 37-38, 40, 45).  Indeed, the "los[s] of an

opportunity to participate in a real estate investment venture" is "a quintessential example

of a business transaction" and, therefore, "not cognizable under the FCRA."  Podell, 914

F. Supp. at 1036 (rejecting damages claim based on potential business partner's decision

to abandon joint venture after receiving plaintiff's personal credit report).  In an effort to

avoid this conclusion, Frydman maintains that "developing" case law somehow suggests

that business damages are fair game as long as the credit reports in question are used for a

"permissible purpose" under the FCRA.  (See Pl.'s Mem. at 18-19).  Interestingly, much

of the "developing" case law that Frydman cites is more than twenty years old.  More

importantly, even those cases expressly indicate that credit reports about individuals

issued for commercial, business, or professional purposes are outside the scope of the

FCRA.  See, e.g., Ippolito v. WNS, Inc., 864 F.2d 440, 449-52 (7th Cir. 1988); Zeller v.

Samia, 758 F. Supp. 775, 780 (D. Mass. 1991).

Frydman also appears to argue that his business damages should be considered recoverable consumer damages because the economic benefit derived from the shell entities "flows up" to him.  (Pl.'s Mem. at 2).  He further notes that "[n]one of the entities established for these transactions had any assets or any activity prior to the anticipated closing of the transactions, these loans were all made or rejected based on [his] personal credit worthiness . . . , and he was to be the borrower, the co-borrower and/or the guarantor."  (Pl.'s 56.1 Resp. ¶ 27).  What is at issue, however, is the nature of the transaction being financed.  Regardless of Frydman's financial exposure, the loans clearly were sought so that Frydman could enter into business transactions.  As a matter of law, therefore, the loans cannot form the basis for consumer damages.  See Tilley v. Glob. Payments, Inc., 603 F. Supp. 2d 1314, 1328-29 (D. Kan. 2009) ("Because the FCRA only protects individual consumers, losses to [p]laintiff's limited liability compan[y] are not recoverable under the FCRA.") (alterations in original) (quoting Johnson v. Wells Fargo Home Mortg., Inc., 558 F. Supp. 2d 1114, 1132 (D. Nev. 2008)); Natale v. TRW, Inc., No. 97 Civ. 3661 (CRB), 1999 WL 179678, at *4 (N.D. Cal. Mar. 30, 1999) ("The form of ownership, however, is immaterial; . . . the FCRA does not apply to transactions related primarily to businesses operated by the consumer.").

Accordingly, even if the Court were to assume Frydman could establish that his business damages were proximately caused by the Defendants' violation of one or more of their duties under the FCRA, he would not be entitled to compensation.

### 2.   Consumer Damages

Frydman also claims modest consumer damages in the form of (a) higher payments on a Mazda vehicle lease for his housekeeper, and (b) reward points that he lost when his Bank of America credit card was not renewed.  (Defs.' 56.1 Stmt. ¶¶ 51-52, 54-55; Frydman Tr. 180-82, 184-85, 547-48).  Frydman, however, has failed to present any admissible evidence that these adverse actions were causally connected to any inaccurate information provided to Mazda or Bank of America by the Defendants.  This is fatal to these claims.  See Burns v. Bank of Am., 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008), aff'd, 360 F. App'x 255 (2d Cir. 2010) ("To obtain an award of actual damages under the [FCRA], [a p]laintiff[] must present evidence of a causal relation between the violation of the statute and the loss of credit, or some other harm.") (first alteration in original).

### a.   Mazda Lease

Frydman testified at his deposition that, when he went to the dealership after he had agreed to the terms of a car lease over the phone, "[t]he [Mazda] finance manager, . . . said that based on [his] credit report they needed to charge [him] a higher rate of interest."  (Frydman Tr. 181).  According to Frydman, this resulted in his monthly payment increasing by $20.  (Id. at 180, 547-48).

A plaintiff "cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence will be available at trial." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985) (internal citations omitted); see also Fashakin, 2009 WL 790350, at *6 n.10

("While the Supreme Court has recognized that a nonmoving party need not produce evidence in opposition to summary judgment in a 'form' admissible at trial, the nonmoving party nonetheless must give the Court some assurance that such evidence will be in admissible form by the time of trial.") (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)); McNamara v. Guazzoni, No. 98 Civ. 4085 (HB), 1999 WL 322648, at *3 (S.D.N.Y. May 20, 1999) (plaintiff's hearsay statement insufficient to establish causation absent showing of forthcoming admissible evidence).

Frydman has not made the requisite showing in this case.  Although he testified that he would "find someone from Mazda of Poughkeepsie," (Frydman Tr. 549), he has proffered no evidence of the alleged payment increase, or the reasons therefor, other than his own self-serving and wholly speculative hearsay testimony, (see Pl.'s 56.1 Resp. ¶ 52).  A "non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' . . . or . . . through 'mere speculation or conjecture.'"  Podell, 914 F. Supp. at 1031 (first ellipsis in original) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)).  Frydman has failed to present admissible evidence from which a reasonable jury could conclude that Mazda increased his interest rate because of inaccurate information provided by the Defendants.  He therefore has failed to meet his burden of establishing the causation element of this claim.  See Burns, 655 F. Supp. 2d at 250-51 ("[D]eposition testimony that [plaintiffs] applied for and were denied loans . . . based upon the alleged inaccurate information in their credit reports is unsubstantiated, speculative, and

conclusory, and insufficient to avoid summary judgment on an issue as to which [they]

bear the ultimate burden of proof.") (internal quotation marks omitted).

   b. <u>Bank of America Credit Card</u>

   In May 2015, Bank of America sent Frydman a letter regarding a credit card

in his name, which stated in relevant part:  "This account has expired or will be expiring

soon.  We won't automatically renew your account."  (Frydman Tr. 185).  Tellingly, this

language suggests that the account might have remained open had Frydman asked that it

be renewed.  In any event, even if Bank of America was canceling the card, there is no

evidence that this was based on Frydman's credit rating.  During his deposition, Frydman

testified that, "based on [his] general knowledge and understanding," "banks generally

don't close credit card accounts unless they've obtained deleterious information from

[CRAs]," (<u>id.</u>), but this obviously is sheer speculation, (<u>see</u> Pl.'s 56.1 Resp. ¶ 56

(conceding that Frydman is relying exclusively on the text of the letter and "his

speculation")).  Accordingly, in the absence of any admissible evidence regarding Bank

of America's alleged policy, Frydman has failed to carry his burden with respect to the

causation element of this claim.

   The Defendants are therefore entitled to summary judgment with regard to

all of Frydman's claimed consumer damages.

   3. <u>Emotional Damages</u>

   Actual damages "may include humiliation and mental distress, even in the

absence of out-of-pocket expenses."  <u>Casella</u>, 56 F.3d at 474.  "A plaintiff's emotional

damages must, however, be demonstrable, as otherwise there is a risk that claims for emotional distress will be fictitious and trivial."  <u>Wenning</u>, 2016 WL 3538379, at *20 (internal quotation marks omitted).  "The case law further reflects that a plaintiff's emotional injury claim is more likely to survive summary judgment where it is detailed, objective, and corroborated," rather than conclusory, unsupported, or subjective.  <u>Id.</u> (collecting cases).  Thus, "[p]laintiffs who rely on their own testimony must explain their injury in reasonable detail and not rely on conclusory statements."  <u>Id.</u> (internal quotation marks omitted).

Frydman neither alleged in his Amended Complaint that he suffered emotional distress as a result of the Defendants' actions, (<u>see</u> Am. Compl.), nor made reference to such damages in his memorandum or declaration in opposition to the Defendants' summary judgment motion, (<u>see</u> Pl.'s Mem.; Frydman Decl.).  Although Frydman does refer in passing to suffering "embarrassment and humiliation" elsewhere in his opposition papers, he concedes that he did not suffer mental or emotional distress. (<u>See, e.g.</u>, Pl.'s 56.1 Resp. ¶¶ 76, 154; ECF No. 115 (Pl.'s Resp. to Equifax's Suppl. Rule 56.1 Stmt. ("Pl.'s Equifax 56.1 Resp.")), ¶¶ 74-75).  He also does not elaborate on his symptoms or their cause, and admits that he never sought medical treatment.  (<u>See</u> Pl.'s 56.1 Resp. ¶ 77; Pl.'s Equifax 56.1 Resp. ¶ 75; <u>see also</u> Nicodemus Decl., Ex. D at 25-26; ECF No. 101 (Decl. of Joshua A. Weiner, Esq., dated Jan. 4, 2016), Ex. B at 32; ECF No. 111 (Decl. of Tracy Klingler, Esq., dated Jan. 4, 2016), Ex. A at 17 (Frydman's discovery responses)).  It follows that his statements regarding embarrassment and humiliation are

entirely conclusory.  Moreover, Frydman has adduced no evidence tending to connect any

embarrassment or humiliation he may have suffered to the Defendants' violation of any

duty under the FCRA.  Accordingly, Frydman has not produced evidence sufficient for a

reasonable jury to award emotional damages in this case.

      C.    <u>Willful Violations</u>

As noted above, Frydman's negligent violation claims fail because no

reasonable juror could conclude that he suffered any actual damages cognizable under the

FCRA.  However, "[e]ven if [a p]laintiff is not entitled to actual damages, he may still be

entitled to punitive damages based on sufficient proof that [a CRA] willfully violated

various provisions of the FCRA."  <u>Gorman</u>, 2008 WL 4934047, at *8 (internal quotation

marks omitted); <u>see also</u> 15 U.S.C. § 1681n(a) (punitive damages available for "willful[]

fail[ure] to comply" with duties).

In his opposition papers, Frydman argues that the Defendants acted

"willfully" by "ignoring" the August 29 Order and the Porsche Financial Letter.  (<u>See</u>

Pl.'s Mem. at 17-18; Frydman Decl. ¶ 31).  In doing so, Frydman apparently concedes

that he cannot establish willful violation claims with respect to the Chase Auto or Capital

One Auto accounts.  Indeed, he does not discuss these accounts at all in his memorandum

in opposition, (<u>see</u> Pl.'s Mem.), and mentions them only in passing in his declaration, (<u>see</u>

Frydman Decl. ¶ 36).  The sole remaining issues under the FCRA are therefore whether,

with regard to the Atlantic Concrete Judgment and the Porsche Financial account,

Frydman is able to show that (1) the Defendants failed either to follow reasonable

procedures to assure the accuracy of the information they originally reported or to

conduct a reasonable reinvestigation and, if so, (2) the violation was willful.

       1.     <u>Section 1681e(b)</u>

       "Under the statutory scheme, a [CRA] is not strictly liable for inaccuracies

in a credit report." <u>Podell</u>, 914 F. Supp. at 1032.  Rather, to establish liability pursuant to

Section 1681e(b), "the consumer must show that the [CRA] failed to follow reasonable

procedures in generating the inaccurate report. . . . The standard for evaluating the

reasonableness of a[] [CRA]'s procedures is what a reasonably prudent person would do

under the circumstances." <u>Wenning</u>, 2016 WL 3538379, at *16 (quoting <u>Whelan v. Trans

Union Credit Reporting Agency</u>, 862 F. Supp. 824, 829, 831 (E.D.N.Y. 1994)) (internal

quotation marks omitted).   Accordingly, a plaintiff "cannot rest on a showing of mere

inaccuracy . . . [and has the] burden to prove that the [CRA] acted unreasonably in the

circumstances." <u>Podell</u>, 914 F. Supp. at 1032.

       A jury reasonably could conclude that the Defendants reported inaccurately

with respect to the Atlantic Concrete Judgment (after it had been vacated) and the Porsche

Financial account (which was described as charged off).  Courts have consistently held,

however, that a CRA does not violate its duty to assure reasonable accuracy pursuant to

Section 1681e(b) simply by reporting an inaccurate debt or judgment, absent prior reason

to believe that its source was unreliable.  <u>See, e.g.</u>, <u>Wright v. Experian Info. Sols., Inc.</u>,

805 F.3d 1232, 1240 (10th Cir. 2015) (CRAs did not err by relying on LexisNexis to

collect information from county recorder's website, because the erroneously reported tax

lien was "not inaccurate on its face, inconsistent with information the CRAs already had on file, or obtained from a source that was known to be unreliable."); Sarver v. Experian Info. Sols., 390 F.3d 969, 972 (7th Cir. 2004) (The FCRA "does not hold a [CRA] responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the [CRA] receives notice of systemic problems with its procedures."); Ogbon v. Beneficial Credit Servs., Inc., No. 10 Civ. 3760 (PAE), 2013 WL 1430467, at *7 (S.D.N.Y. Apr. 8, 2013) (no liability absent a "basis on which a jury could find that the defendants had a basis to question the accuracy of the reports . . . that [the plaintiff] herself had incurred the debts in question").

Courts similarly have rejected the contention that CRAs are required to conduct manual reviews of all the items that they receive before including them in a consumer's credit file.  See, e.g., Henson v. CSC Credit Servs., 29 F.3d 280, 285-86 (7th Cir. 1994) ("Requiring [CRAs] to look beyond the face of every court document to find the rare case when a document incorrectly reports the result of the underlying action would be unduly burdensome and inefficient."); Wright, 805 F.3d at 1241 (CRAs not required to "employ individuals trained in American tax law" to examine every tax lien before including it in a credit report); Wenning, 2016 WL 3538379, at *18 (noting that in cases "involv[ing] the sort of unfortunate mix-ups that are endemic to a largely automated and computerized credit reporting system processing millions of updates every day," courts "were rightly concerned about construing the FCRA to compel CRAs to undertake onerous human review of presumptively trustworthy documents, such as court records").

Each of the Defendants has provided a knowledgeable representative's statement setting forth its standard procedures for assuring the accuracy of information in consumers' credit files.  These submissions confirm that LexisNexis, Porsche Financial, Chase Auto, and Capital One Auto are generally reliable sources of consumer credit information, and that the Defendants had no notice of systemic problems with the information these companies provided.  (See Wilson Aff. ¶¶ 2-43; Scott Decl. ¶¶ 3-18; Leslie Decl. ¶¶ 7-25; Smith Decl. ¶¶ 15-32).  Frydman has adduced no evidence to the contrary, beyond his repeated mantra that the vast majority of the Defendants' representatives' statements are "Lies."  (See, e.g., ECF Nos. 130, 137, 140, 143).[17] Frydman also has cited no legal support for his suggestion that merely because LexisNexis is not a "furnisher" as defined by FCRA, it has no duty to itself assure the accuracy of its information and, thus, may never be relied upon by CRAs.  (See, e.g., Pl.'s

---

[17]     Affidavits and declarations submitted in support of summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The information contained in the Defendants' submissions professes to be based upon personal knowledge, (see Wilson Aff. ¶ 1; Scott Decl. ¶ 1; Leslie Decl. ¶ 3; Smith Decl. ¶ 3), and Frydman has identified no admissibility issues.  Although Frydman also argues that the Defendants' representatives' statements should be stricken because they contradict other evidence, such as their deposition testimony, or that they should be barred from opining about matters they did not discuss at their depositions, these arguments are unavailing.  Even assuming that contradictions exist, "[i]n the ordinary case where a district court is asked to consider the contradictory deposition testimony of a fact witness, or where the contradictions presented are not 'real, unequivocal, and inescapable,' the general rule remains that 'a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury.'" In re Fosamax Prods. Liab. Litig., 707 F.3d 189, 194 n.4 (2d Cir. 2013) (quoting Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010)).  Accordingly, Frydman's motions to strike should be denied.

56.1 Resp. ¶ 61).  Indeed, in the agreement between LexisNexis and Trans Union,

LexisNexis represents and warrants that it has the requisite experience and ability and

will perform its work in a "professional, competent and timely manner."  (Frydman Decl.,

Ex. L at 11).  Frydman has not adduced any evidence that it was unreasonable for the

Defendants to rely on such undertakings in the first instance.[18]

Accordingly, it is clear that, prior to the September 22 Letters, the

Defendants did not fail to follow reasonable procedures to assure accuracy merely by

including the disputed information in Frydman's credit file.  See, e.g., Henson, 29 F.3d at

285 (A CRA is not liable "for reporting inaccurate information obtained from a court's

Judgment Docket, absent prior notice from the consumer that the information may be

inaccurate."); Ogbon, 2013 WL 1430467, at *7 (no genuine issue as to whether CRAs

followed reasonable procedures where they "provided detailed explanations of the

procedures they utilize to [as]sure the accuracy of their credit reports" and the plaintiff

"identified no basis . . . to question the accuracy of the reports it had received"); Podell,

914 F. Supp. at 1035 (CRA "entitled to report [inaccurate debt], at least until it heard

from [the] plaintiff directly.").  Frydman consequently is unable to establish that the

Defendants violated their duties pursuant to Section 1681e(b) – much less that any such

---

[18]     Frydman also argues that LexisNexis had no duty to assure the accuracy of its
reporting by virtue of an indemnification provision in its agreements.  (See, e.g., Pl.'s 56.1 Resp.
¶ 61).  Suffice it to say, the mere existence of such provisions does not suggest that the vendors
have no obligation to report information accurately, or that it was unreasonable for the
Defendants to rely on them.  In fact, at least one Judge in this District has recently referred to
LexisNexis as an "established, reputable vendor" with a "concededly excellent reputation."
Wenning, 2016 WL 3538379, at *18.

violation was willful – and summary judgment should be granted with respect to his claims relating to the Defendants initial reporting.

     2.     Section 1681i(a)(1)(A)

In his papers, Frydman appears to take issue primarily with the Defendants' alleged violation of their duty to conduct a reasonable reinvestigation pursuant to Section 1681i(a)(1)(A). According to Frydman, the Defendants' failure to do more than simply reconfirm the disputed items of information in his credit file with the original sources of that information is proof of a "systemic problem" within the credit reporting industry. (See, e.g., Pl.'s 56.1 Resp. ¶¶ 61, 87-89, 113, 168).

Judge Colleen McMahon considered the extent of a CRA's duty to go beyond the original source of disputed information in Jones v. Experian Info. Sols., Inc., 982 F. Supp. 2d 268 (S.D.N.Y. 2013). There, the plaintiff disputed several items in her credit file, alleging they were the result of identity theft. Id. at 270. Recognizing that "[t]he Second Circuit has not directly addressed what constitutes a reasonable reinvestigation under [S]ection 1681i," Judge McMahon relied on decisions from the Third, Fifth, and Seventh Circuits, stating as follows:

> These courts have held that "the reinvestigation required by [S]ection 1681i(a) demands more than (a) forwarding the dispute information onto the furnisher of information and (b) relying on the furnisher of information's response." Gorman, 2008 WL 4934047, at *5 (citing Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3rd Cir. 1997); Henson, 29 F.3d at 287; Stevenson v. TRW Inc., 987 F.2d 288, 293 (5th Cir. 1993)). "The statutory responsibility imposed on the [CRA] 'must consist of something more than merely parroting

information received from other sources.'" Gorman, 2008
WL 4934047, at *5 (quoting Cushman, 115 F.3d at 225).

"In order to fulfill its obligation under [Section]
1681i(a) a [CRA] may be required, in certain circumstances,
to verify the accuracy of its initial source of information."
Cushman, 115 F.3d at 225 (quoting Henson, 29 F.3d at 287).
Courts have noted that a number of factors will determine the
extent of the CRA's reinvestigation:  "One of these factors is
whether the consumer has alerted the [CRA] to the possibility
that the source may be unreliable or the [CRA] itself knows or
should know that the source is unreliable.  A second factor is
the cost of verifying the accuracy of the source versus the
possible harm inaccurately reported information may cause
the consumer."  Id. (quoting Henson, 29 F.3d at 287).
Ultimately, it is up to the trier of fact to weigh these
considerations in determining whether the CRA conducted a
reasonable reinvestigation under [S]ection 1681i.  Id.

Id. at 273 (brackets and parentheticals in original omitted).  Although the plaintiff in

Jones did not provide documentation of the purported identity theft, Judge McMahon

nonetheless denied summary judgment on the issue of reasonableness because Experian

had failed to do more than reconfirm the disputed items with its original sources, despite

being advised of obvious discrepancies in the documentation concerning birth dates,

names, and addresses.  Id. at 274-75.[19]

Judged by the Jones standard, the Defendants' decision in this case to

recontact their original information sources, but do nothing more, arguably may not have

satisfied their statutory duty to conduct a reasonable reinvestigation.  See Frost, 1998 WL

---

[19]      None of the Defendants cite Jones in their moving papers despite its clear
relevance.  (See ECF No. 96 ("Trans Union Mem.")); ECF No. 100 ("Experian/Equifax
Mem.")).  Instead, they rely primarily on older decisions from other districts.  (See ECF No. 124
at 7-8; Trans Union Reply at 7-9 (citing George, 2010 WL 3937308; Spector v. Experian Info.
Sols., 321 F. Supp. 2d 348 (D. Conn. 2004))).

765178, at *3 ("Even if the defendants' initial reliance on court records was reasonable, a

failure to reinvestigate in the face of [the plaintiff]'s protestations and his representation

that the records had been corrected may not have been reasonable.") (citing Cushman,

115 F.3d at 223-26; Henson, 29 F.3d at 286-87); Gorman, 2008 WL 4934047, at *6

("Given the standard articulated in Cushman and Experian's claimed sole reliance on the

information it received from [the furnisher], a jury could conclude that Experian did not

reinvestigate [the p]laintiff's dispute in accordance with the requirements of [Section]

1681."). As the Third Circuit has observed, "the parameters of a reasonable investigation

will . . . depend on the circumstances of a particular dispute." Cortez v. Trans Union,

LLC, 617 F.3d 688, 713 (3d Cir. 2010).

                        a.      Atlantic Concrete Judgment

       Turning first to the reasonableness of the Defendants' reinvestigation of the

Atlantic Concrete Judgment, the August 29 Order stated, in relevant part:

> Accordingly, defendants' motion [to vacate the default
> judgment] is granted. . . .
>
> This shall constitute the decision and order of the
> Court. The original decision and order and all other papers
> are being delivered to the Supreme Court Clerk for
> transmission to the Ulster County Clerk for filing. The
> signing of this decision and order shall not constitute entry or
> filing under CPLR 2220. Counsel is not relieved from the
> applicable provisions of that rule regarding notice of entry.

(August 29 Order). Although the parties agree that the August 29 Order was not stamped

as "entered" by the Ulster County Clerk until September 5, (see Pl.'s 56.1 Resp. ¶ 12), a

reasonable jury nonetheless could conclude that the unstamped copy Frydman included

with the September 22 Letters sufficed to alert the Defendants that the Atlantic Concrete

Judgment might no longer be valid and counsel further reinvestigation.[20]  The amount of

the judgment also clearly weighed in favor of further revinvestigation.  See Jones, 982 F.

Supp. 2d at 273.

        The Defendants, however, have provided no evidence that they did anything

more than send ACDVs to LexisNexis identifying Frydman's dispute, pursuant to their

standard reinvestigation procedures.  Moreover, they have neither provided evidence that

LexisNexis recontacted Ulster County as part of its verification process, nor identified

any reason why they could not have done so themselves.  This is particularly troubling in

light of the fact that it is at least possible, if not likely, that further direct contact with

Ulster County would have successfully resolved Frydman's dispute.  See, e.g., Cornock v.

Trans Union LLC, 638 F. Supp. 2d 158, 167 (D.N.H. 2009) ("The crucial difference

between [this] case and Cushman is that, there, investigating beyond the creditor's

verification could have turned up information casting doubt on the validity of the debt

while, here, that exercise would have turned up no more than an arbitration award

---

[20]    This is true even though the Defendants maintain they could not use the August
29 Order to update Frydman's credit file themselves because it was not court stamped and the
reference numbers did not match.  (See Wilson Aff. ¶ 46; Scott Decl. ¶ 20; Smith Decl. ¶ 38).
What they overlook is that certain of the errors should have been easily discoverable.  For
example, Experian evidently was perplexed by the reference to "Tompkins Cnty Supreme," even
though the address for that court which was supplied to it was in Kingston, New York.  (See
Scott Decl., Ex. D).  Similarly, it is not unreasonable to expect that a CRA or its vendor would
recognize that an RJI number is different than an index number.  Given the clear similarities
between the judgment referenced in the August 29 Order and the one that appeared in the
September 11 Disclosures, a reasonable jury could conclude that, despite the confusion about
numbering and the lack of a court stamp, the August 29 Order necessitated further
reinvestigation.

affirming the validity of the debt."); Peterson v. Am. Express, No. 14 Civ. 2056 (PHX)

(GMS), 2016 WL 1158881, at *5 (D. Ariz. Mar. 23, 2016) ("[I]n light of the fact that [the

furnisher] continued to verify that the disputed account should remain on [the plaintiff]'s

credit report despite the undisputed fact that an arbitrator found [him] not personally

liable for it, a jury could find that the CRAs needed to undergo more than just their

normal ACDV reinvestigation process in this case."). It follows that a jury could

reasonably conclude that the Defendants failed to conduct a reasonable reinvestigation

concerning the Atlantic Concrete Judgment.

b.      Porsche Financial Account

Turning to the Porsche Financial account, Frydman admits that he enclosed

no additional documentation with the September 22 Letters, and did not forward the

Porsche Financial Letter to the Defendants' legal officers until late October 2014. (See

September 22 Letters; Pl.'s 56.1 Resp. ¶¶ 13-14). Frydman's eventual production of the

Porsche Financial Letter, however, arguably triggered the need for yet another

reinvestigation.[21] Although Experian and Equifax deny receiving the Porsche Financial

Letter promptly, (see Scott Decl. ¶ 29; Smith Decl. ¶ 57), Frydman expressly referred to

the Porsche Financial Letter in his original complaints, dated November 14, 2014, (see

ECF No. 1, ¶ 16; 14cv9015-PAC-FM, ECF No. 1, ¶ 16). Accordingly, a jury could

reasonably conclude that, by October or November 2014, Experian and Equifax should

---

[21]     The FCRA allows CRAs to refuse to reinvestigate a successive dispute as frivolous, but requires notice to the consumer of the decision not to reinvestigate. See 15 U.S.C. § 1681a(3). There is no such notice in this case.

have initiated a second reinvestigation regarding the Porsche Financial account, which they did not.  Although the comparatively small size of the debt, the ambiguity of language in the letter, and the fact that Porsche Financial was the creditor and not a third party may ultimately persuade a jury that Experian and Equifax acted reasonably, this is a matter for the jury, not the Court, to decide.[22]

c.      Willfulness

Finally, the Court must consider whether the Defendants willfully violated Section 1681i(a)(1)(A) as to the Atlantic Concrete Judgment and the Porsche Financial account.  The Supreme Court has held that the requirement of willfulness in this context can be satisfied by evidence of "reckless disregard" for statutory duties.  Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 56-57 (2007).  To constitute reckless disregard, however, a CRA's interpretation of its statutory duties must be "objectively unreasonable," not merely "erroneous."  Id. at 69.

The Defendants in effect argue that they could not have willfully violated Section 1681i(a)(1)(A) because they followed their standard reinvestigation procedures by sending ACDVs to LexisNexis and Porsche Financial.  (See Trans Union Mem. at 21-22, 25-27; Experian/Equifax Mem. at 15-17).  As Judge McMahon has noted, however, it is not objectively reasonable for a CRA to insist that its duty is satisfied merely by transmitting an ACDV to a source of information and relaying the source's response to

---

[22]      Frydman may not recover any damages from Trans Union relating to the Porsche Financial account because Trans Union deleted the item from his credit file before the expiration of the original thirty-day reinvestigation period.  (See Wilson Aff. ¶ 49).

the consumer.  See Jones, 982 F. Supp. 2d at 276 ("Since [Experian] has introduced no evidence of what its investigation consisted [of] other than sending a[n ACDV] to the furnisher, a reasonable jury could conclude [Experian] recklessly disregarded its statutory duty to conduct a reasonable investigation – especially in light of the discrepancies between [the p]laintiff's information and the information provided by the furnishers.").

      None of the Defendants in this action are newcomers to this field, and they all were or should have been on notice that their duty to reinvestigate might, in some circumstances, be heightened.  See id. at 273 (noting that Experian had unsuccessfully attempted to rely on its standard reinvestigation procedures several years earlier in Gorman).  Accordingly, in light of the standard set forth in Jones, a jury could reasonably conclude that the Defendants' violation of their duties pursuant to Section 1681i(a)(1)(A) was willful.[23]  The Defendants' motion for summary judgment should consequently be denied as to Frydman's claims for  the willful violation of Section 1681i(a)(1)(A) with respect to (a) the Atlantic Concrete Judgment as against all of the Defendants, and (b) the Porsche Financial account as against Experian and Equifax only.

    D.    State Law Claims

      Frydman also asserts New York state law claims sounding in negligent misrepresentation, defamation, defamation per se, negligence, and injurious falsehood.

---

[23]     Although Trans Union additionally contends that Frydman must demonstrate that information included in Frydman's credit file as a result of the Defendants' willful violations was disclosed to third parties, (see Trans Union Mem. at 12), this argument was clearly rejected in Jones, see 982 F. Supp. 2d at 276 (finding the "contention that [the p]laintiff has no cause of action under the FCRA since the disputed credit items were not provided to a third party . . . without merit").

(See Am. Compl. ¶¶ 70-101, 106-37, 142-73).  The Defendants argue that the FCRA

preempts all of these claims.

> Insofar as relevant, Section 1681h(e) of the FCRA provides that:
>
> Except as provided in [S]ections 1681n and 1681o . . . , no
> consumer may bring any action or proceeding in the nature of
> defamation, invasion of privacy, or negligence with respect to
> the reporting of information against any [CRA] . . . except as
> to false information furnished with malice or willful intent to
> injure such consumer.

15 U.S.C. § 1681h(e) (emphasis added).  This provision essentially affords the

Defendants qualified immunity against the types of state law claims asserted by Frydman

unless he can establish that they acted "with malice or willful intent to injure" him.  See

Ogbon, 2013 WL 1430467, at *10; see also Ross v. F.D.I.C., 625 F.3d 808, 814 (4th Cir.

2010) ("Congress intended this section's general bar . . . to be the quid pro quo for

providing full disclosure under the FCRA.  The only exception to this bar is a narrow

one.") (internal citation omitted).

Although the Second Circuit has yet to opine, other Circuits have indicated

that a showing of "malice or willful intent to injure" requires something more than the

"willful failure to comply" with statutory duties that is the prerequisite to an award of

punitive damages under Section 1681n.  See Thornton v. Equifax, Inc., 619 F.2d 700, 705

(8th Cir. 1980) ("The same standard of proof as required in [S]ection 1681h(e) . . . is not

required for allegations of noncompliance with the provisions and requirements of the

Act."); Cushman, 115 F.3d at 229 ("The parties have assumed that a showing of 'malice

or willful intent to injure' pursuant to [Section] 1681h(e) is identical to proof of

willfulness under [Section] 1681n.  This is contrary to the holding of the . . . Eighth

Circuit in Thornton."); Pinner v. Schmidt, 805 F.2d 1258, 1263 (5th Cir. 1986) ("Punitive

damage awards are permitted even without malice or evil motive.").  District courts

around the country also have reached the same conclusion.  See, e.g., Serfess v. Equifax

Credit Info. Servs., No. 13 Civ. 406 (RBK) (JS), 2014 WL 4272032, at *9 (D.N.J. Aug.

28, 2014) ("The statutory requirement of malice or willful intent to injure contemplated

by [Section] 1681h(e) is of a higher degree than that which supports a claim of statutory

or punitive damages under [Section] 1681n.") (internal quotation marks omitted); Brown

v. Sterling Infosystems, Inc., No. 10 Civ. 697, 2010 WL 3057844, at *5 n.5 (N.D. Ohio

Aug. 2, 2010) ("Defendant is correct that [the] plaintiffs' allegation of willful

noncompliance on behalf of [the] defendant does not rise to level of malice or willful

intent to injure required to avoid [Section] 1681h(e) immunity.") (internal quotation

marks omitted); Reed v. Experian Info. Sols., Inc., 321 F. Supp. 2d 1109, 1117 (D. Minn.

2004) ("The malice or willful intent to injure contemplated by [Section] 1681h(e) is of a

higher degree than that which supports a claim of statutory or punitive damages under

[Section] 1681n.") (citing Pinner, 805 F.2d at 1263).  Indeed, to hold otherwise would

conflate the two standards and "void the effect of the qualified immunity section of the

Act."  Thornton, 619 F.2d at 706.

Here, even if Frydman is able to persuade a jury that the Defendants

"willfully failed to comply" with their duty to conduct a reasonable reinvestigation

pursuant to Section 1681i(a)(1)(A), he clearly intends to do so on a theory of systemic

incompetency and profit-driven behavior, not malicious intent to injure him personally.
(See generally Pl.'s Mem.; Frydman Decl.).  Moreover, he has adduced no evidence
which would allow a reasonable jury to conclude that the Defendants knew either that the
Atlantic Concrete Judgment had been vacated, or that the Porsche Financial account had
never been charged off.  Accordingly, even if he is able to establish that the Defendants
should have reinvestigated further, this does not rise to the level of malice or willful intent
to injure him.  His state law claims consequently are preempted by the FCRA, and
summary judgment should be entered as to those claims.

      E.     Motions to Strike

      As noted previously, Frydman's motions to strike should be denied.  See
supra, note 17.  In addition, except to the extent discussed in this Report and
Recommendation, none of Frydman's submissions that the Defendants seek to strike are
material to the survival of his few remaining claims.  Accordingly, the Defendants'
motion to strike should be denied as moot.

VI.    Conclusion

      For the foregoing reasons, the Defendants' motion for summary judgment,
(ECF No. 95), should be granted in part and denied in part.  Specifically, summary
judgment should be denied with respect to Frydman's claims for the willful violation of
Section 1681i(a)(1)(A) as to all of the Defendants with regard to the Atlantic Concrete
Judgment, and as to Experian and Equifax with regard to the Porsche Financial account.
Summary judgment should be granted as to all other claims in the Amended Complaint.

In addition, the Defendants' motion to strike, (ECF No. 126), should be denied as moot, and Frydman's motions to strike (ECF Nos. 129, 135, 139, 142), should be denied.

VII.   Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, to my chambers at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Crotty.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

SO ORDERED.

Dated:      New York, New York
            August 11, 2016

_____
FRANK MAAS
United States Magistrate Judge

Copies to:

Plaintiff pro se and defense counsel (via ECF)